IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DIGITAL ENCODING FACTORY, LLC,       )
MEDIA HOLDINGS, LLC and              )
EDA ACQUISITON, LLC,                 )
    Plaintiffs,                      )       Civil Action No. 06-1449
                                     )
       vs.                        )       Magistrate Judge Lisa P. Lenihan
                                     )
IRON MOUNTAIN INFORMATION            )
MANAGEMENT, INC.,                    )
    Defendant.                       )

## OPINION ON MOTION FOR SUMMARY JUDGMENT

### I. Conclusion

The Motion for Summary Judgment filed by Defendant Iron Mountain Information

Management, Inc., (hereafter "Iron Mountain") will be granted as to Count I, Breach of Joint

Venture Agreement, and Count III, Breach of Fiduciary Duty, and denied as to the remaining

claims, as more fully set forth below.

## II. <u>Factual and Procedural History</u>

As discussed in this Court's July 5, 2007 Report and Recommendation, Plaintiffs (hereafter "the Imagers") allege that Iron Mountain breached oral agreements relating to their exclusive provision of document imaging/digitization services to Iron Mountain's storage facility customers.  More particularly, they allege that Plaintiff Digital Encoding Factory, LLC ("DEF") entered into a lease agreement (the "Lease") for space in Iron Mountain's expansive underground document storage facility in Boyers, Pennsylvania (the "Boyers facility") (1) as part of an undertaking, with Iron Mountain, to expand Iron Mountain's customer services to include imaging/digitization (*i.e.*, electronic conversion of documents and, subsequently, additional media); and (2) under criteria dictated by Iron Mountain and pursuant to Iron Mountain's representations of significant pre-existing customer need/available business and promises of exclusivity and marketing.[1]  Plaintiffs allege an oral contract with Thomas Roth ("Roth"), Iron Mountain's General Manager of the Boyers facility and later Vice President, under which the Imagers would establish a new imaging/digitization operation within the Boyers facility, and build it to Iron Mountain's specifications (by acquiring multi-million dollar investments/funding, personnel, technology/equipment, expertise and, relatedly, additional business entities);[2] the Imagers would have no direct contract with Iron Mountain's customers; Iron Mountain would

---

[1]  Plaintiffs assert that Iron Mountain serves over 90,000 clients in 26 countries and provides records management services to 98% of the Fortune 100 companies, as well as a wide range of other corporate and Federal and State government clients.  The Boyers facility is the largest underground record storage facility in the United States, containing approximately 1.7 million square feet.  <u>See</u> Second Amended Complaint at 3.

[2]  <u>See</u> <u>id.</u> at 7-8 (asserting that DEF investors spent (a) $400,000 in acquiring Electronic Document Associates of Indiana, Inc., and (b) $2 Million in acquiring Summit Film Lab & Media Services).

both (a) exclusively refer its storage facility customers' imaging business to Plaintiffs and (b) use its best efforts to market the imaging services; and Iron Mountain would profit by adding a 15% markup/surcharge to Plaintiffs' fees when Iron Mountain billed its customers.  They further allege that, while Plaintiffs invested approximately $7.5 Million in the project,[3] Iron Mountain (a) failed to deliver, or to even market, the business repeatedly promised; (b) marked-up Plaintiffs' prices by significantly more than 15%; and (c) ultimately established its own competing imaging/digitization business inside the facility, driving Plaintiffs "to the brink of financial ruin."[4]

The Second Amended Complaint asserts claims for (1) breach of joint venture agreement; (2) breach of contract; (3) breach of fiduciary duty; (4) negligent misrepresentation; and (5) promissory estoppel.

Defendant, in a Motion for Summary Judgment that was commendably briefed by both parties, asserts that Plaintiffs' claims fail, as a matter of law, for the following reasons: (1) all claims for lack of authority; (2) all claims but negligent misrepresentation because the parole evidence rule bars evidence of any oral agreement that would alter the terms of the Lease; (3)

---

[3]  See id. at 2.

[4]  See Second Amended Complaint at 1-2, 14.  Defendant's assertion, in the Introduction to its Memorandum of Law In Support of Motion for Summary Judgment (hereafter the "Memorandum in Support"), that "Plaintiffs base all of their claims on an alleged 30-45 minute telephone conversation in the fall of 2000 between . . . George Medved . . . and Tom Roth" is, in light of these factual allegations and others discussed infra, a mischaracterization.  Cf. Plaintiffs' Brief in Opposition to Motion (hereafter "Brief in Opposition") at 2 (observing that 30 individual's depositions and 759 exhibits include significant evidence in support of their factual allegations).  As noted in the Report and Recommendation, however, the investment of millions of dollars over a period of several years, in and by business entities affiliated with a mature and experienced attorney (i.e., Mr. Medved), on the basis of critical understandings which remained unreduced to writing, is - in this Court's experience -  unusual.

breach of joint venture agreement because the Imagers cannot establish the requisite elements of

a joint venture; (4) breach of fiduciary duty because, in the absence of a joint venture, Iron

Mountain owed no such duty; (5) negligent misrepresentation because it is barred by

Pennsylvania's gist of the action doctrine and by (6) the applicable statute of limitations; and (7)

negligent misrepresentation and promissory estoppel for lack of reasonable reliance.


III.  **Summary Judgment Standard**

Summary judgment is to be granted only when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if proof of its existence or non-

existence might affect the outcome of the suit under applicable law.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.  Id.

All doubts as to the existence of a genuine issue of material fact are resolved against the

moving party, and the entire record is examined in the light most favorable to the nonmoving

party.  Continental Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982).  However, the

nonmoving party may be subject to summary judgment under Rule 56 if, after adequate time for

discovery, it "fails to make a showing sufficient to establish the existence of an element essential

to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp.</u> <u>v. Catrett</u>, 477 U.S. 317, 323 (1986).[5]

## IV.  <u>Analysis</u>

### A. Roth's Authority

Plaintiffs allege, and have proffered evidence, that:

In Fall, 2000, DEF entered discussions with Roth, as General Manager for the Boyers facility, concerning a "partnering arrangement."  Second Amended Complaint at 4.  Both George Medved, a DEF principal, and Roth believed that there was great potential in imaging/digitization, and Roth indicated that numerous Iron Mountain customers were planning to convert their analog data for preservation, and were in need of digitization services.  Roth indicated that it was critical, given the valuable/sensitive nature of much of the archived material, that the digitizing service be set up in the Boyers facility (*i.e.*, that it not require any document transportation).  Roth further indicated that Iron Mountain did not wish to expand its own operations but preferred to (1) partner with an imaging/digitization provider - which would be located in the facility, the exclusive provider, but essentially "invisible" to Iron Mountain's customers; (2) market and sell the services as an additional component of its own client offerings; and (3) make its profit via a 15% mark-up of Plaintiffs' price quotes.[6]

---

[5]  <u>See also</u> <u>Anderson</u>, 477 U.S. at 251-252 (indicating that, distilled to its essence, the summary judgment standard requires the nonmoving party to create a "sufficient disagreement to require submission [of the evidence] to a jury").

[6]  If a potential customer rejected the pricing as to high, the parties were to "jointly reduce their prices in order to obtain the customer's business".  If, after joint reduction, the business was not obtained, Iron Mountain could "obtain a quote from an outside source, which Plaintiffs would be allowed to match."  Second Amended Complaint at 6.

Subsequent to the written Lease, and between 2001 and 2006, Roth gave eight or more presentations and extensive Boyers facility tours to Plaintiffs' prospective investors, during which he repeatedly represented that Iron Mountain "had millions of dollars in [imaging] business" that it would refer to Plaintiffs as the exclusive provider.  Second Amended Complaint at 9.[7]  He also organized an imaging/digitization training/marketing program for Iron Mountain's sales and account management personnel in Pennsylvania, Ohio and New York.[8]  During this time, Plaintiffs were induced to continue to make lease payments to Iron Mountain (and/or to make several further payments on lease amounts assertedly in arrears), and to make additional investments in, *e.g.*, capabilities, on Roth's repeated assurances that more imaging/digitization business would then be forthcoming.  See id. at 11-15.  In addition, Roth continued to issue ongoing directions and further business requirements to Plaintiffs as they responsively developed the in-facility capabilities to meet Iron Mountain's customer service specifications.

A jury may conclude that an agency relationship exists, and the principal is therefore bound, on the basis of express authority, implied authority, apparent authority, and authority that the principal is estopped to deny.  See, *e.g.*, Bolus v. United Penn Bank, 525 A.2d 1215, 1221 (Pa. Super. 1987) (cited in Brief in Opposition at 3).  Iron Mountain, in moving for summary judgment on all counts, asserts that the Imagers had no evidence of Roth's actual authority *nor* any reasonable basis to believe that Roth had apparent authority to enter into the alleged

---

[7]  See also id. at 9-10, 12 (describing Roth's representations to John Shively, iGate, and E&S Acquisition).

[8]  See id. at 11.

agreement/undertakings.  See Memorandum of Law in Support at 6-12.[9]  To the contrary,

Plaintiffs have proffered evidence which is sufficient to proceed to trial.  They have also

correctly presented the basis for estoppel.

More particularly, Iron Mountain's assertion that it is entitled to summary judgment

because the Imagers did not require confirmation/documentation of specific authority, inquire in

Boston as to Iron Mountain's corporate hierarchy/organizational policies/job descriptions, or

otherwise investigate Roth's authority to enter into business contracts for the provision of

services within the storage facility he oversaw as General Manager[10] mistakes the applicable law.

Absent any indication from Iron Mountain to the contrary, a reasonable jury could certainly

conclude that the Imagers properly believed that Roth's (a) repeated representations regarding

Boyers facility clients and their needs, (b) contracting for in-facility services to meet those

needs, (c) ongoing digitizing-service investor-solicitation tours and presentations regarding the

Boyers facility, (d) ongoing identification of the parameters/requirements for supplemental

Boyers client services, and (e) creating/administering  Boyers digitization marketing meeting(s)

---

[9]  The Court observes that although Defendant moves for summary judgment on all
claims for want of authority, its present argument is largely that Roth lacked authority to enter
into a "joint venture" agreement.  See generally Reply Memorandum at 2-6.

[10]  See, e.g., Memorandum in Support at 9 ("Medved admits he never asked Roth whether
he had the necessary authority . . . ."); ("Medved admitted that he knew . . . that Iron Mountain
was a 'sizeable' company with a national presence that was publicly traded and that was
headquartered in Boston.") (internal citations omitted).  Cf. id. at 10 ("There is no evidence . . .
to suggest that anyone [but] an executive at the corporate headquarters in Boston - would have
been in a position to know who at Iron Mountain would have had the authority to enter into an
agreement . . . along the lines alleged by the Plaintiffs."); 11 ("Medved testified . . . that he had
no . . . understanding of 'Iron Mountain's corporate structure and how agreements were
approved.'"); id. at 12 (citing absence of evidence that Medved undertook "reasonably diligent"
inquiry "to determine the nature and extent of Roth's authority").  See also Defendant's Reply
Memorandum at 3.

for multi-state Iron Mountain personnel  were well within his bailiwick as General Manager and

later Vice

President.[11]  Cf. generally Great Northern Ins. Co. V. ADT Sec. Services, Inc., 715 F.Supp.2d

723, 746 (W.D. Pa. 2007) (noting that nature and extent of agent's authority is generally a jury

---

[11] Although Defendant attempts to make much of review/revision of the Boyers facility
Lease by Iron Mountain's legal counsel when the provisions of the parties' rental agreement
were reduced to writing, and prior to its execution by Roth, knowledge that a company's legal
counsel drafts and/or reviews documents prior to signature does not generally indicate that the
corporate official lacked authority to negotiate the terms of the underlying agreement.  To the
contrary, the legal department's function is often to ensure that the terms proposed/negotiated by
the corporate official are appropriately drafted, communicated, and/or implemented in writing.
Compare Memorandum in Support at 11 (suggesting that knowledge of legal counsel's review
equated with "actual knowledge of" limits on Roth's authority).  At a minimum, Plaintiffs'
knowledge of legal review of the Lease certainly does not compel a reasonable fact finder to
conclude that Plaintiffs should therefore have questioned Roth's authority to enter into a binding
oral agreement regarding their investment in the development of in-facility capabilities to meet
the needs of Iron Mountain's storage clients.

Defendant's assertion that "[i]t is particularly significant that Medved admitted that he
was aware . . . that Roth was consulting with . . . legal counsel, in Boston, about the proposed
lease restriction that Medved had drafted", id. at 11, is similarly off-the-mark.  That Roth looked
to the company's legal counsel for guidance on a lease revision proposed by Plaintiffs does not
suggest that he was required to seek approval for imaging/digitization service
requirements/terms that were communicated to Plaintiffs by Roth on behalf of Iron Mountain.
Nor does it follow that, because he was aware the written Lease revision was being reviewed,
Medved was or should have been aware that the client service agreement was not.  Again, there
is no indication that Iron Mountain apprised Plaintiffs of its corporate hierarchy, job parameters,
or internal procedures.

Defendant also suggests it was unreasonable for Medved to believe Roth had authority to
enter into the oral contract because Medved, as managing partner for the Pittsburgh offices of
Philadelphia law firms, lacked the authority to enter into building leases for those firms.  See
Memorandum in Support at 9.  The Court observes that the agreement at issue was not for Iron
Mountain's underground mine facility itself.  It was for necessary/desirable supplemental
services for the business operation within that facility, overseen by Roth as General Manager.
Compare Defendant's Reply Memorandum at 5-6 (describing parties' arrangements as "perfectly
consistent with a subcontractor relationship, whereby Iron Mountain would find a third party to
perform a service for a customer and then charge that customer a premium"); Brief in Opposition
at 4 (citing evidence that Roth had authority to arrange ancillary services for cleints "so long as
the margins were within the 15% range", as this was).

question); Amco Ukrservice v. Am. Meter Co., 312 F.Supp.2d 681, 696 (E.D. Pa. 2004).  It could also conclude that Defendant is estopped from asserting that Roth lacked authority.

As Defendant observes, in considering apparent authority, the Court looks to reasonable interpretations of the actions of the principal.  See Memorandum in Support at 7-8.  The Imagers indicate, *e.g.*, that Roth held himself out as having the authority to enter into business transactions for the Boyers facility; his title was that of General Manager of the facility (and later Vice President); and he appeared, during the Imagers' and prospective investors' interactions with him at the facility, to be - and was identified by other Iron Mountain personnel as being - in authority over the facility.  There is no evidence that Defendant communicated by word or deed that its Boyers General Manager had restricted authority over the facility or, *e.g.*, lacked authority to enter into supplemental client service contracts or "partnerships".[12]

Nor does the evidence indicate that Plaintiffs had reason to believe that Iron Mountain was unaware of Roth's activities.  Rather, Plaintiffs' evidence suggests that Roth went about the business of the Boyers facility imaging/digitization services - including facility investor tours and presentations and Iron Mountain personnel training seminar(s) - for years, with Iron Mountain's knowledge.[13]  And that Iron Mountain took no steps to disabuse Plaintiffs of their

---

[12]  Cf. Brief in Opposition at 4 (citing evidence that documentation from Defendant's corporate offices contained no limit on Roth's authority, and that Roth's supervisor at time of his promotion to Vice President in 2005 was "unaware of any document or manual which delineated - or limited - his authority or what his responsibilities were").  Compare *supra* n. 10.

[13]  Cf. Plaintiffs' Sur-Reply Brief at 1 (asserting that "parties openly operated [under digitization relationship] for approximately five (5) years"); id. at 3-5 (citing Roth's 2005 Performance Management Self Evaluation referencing "partnerships" he created "for imaging film and documents, video and audio tapes" and his supervisor's recognition of same); id. at 5 (discussing Roth's supervisor's awareness of his negotiations regarding 2005 investment in/restructuring of Plaintiff entity, including Letter of Intent that encompassed "writing a new lease and service agreement").

impression of Roth's authority or to disavow the representations and undertakings communicated by him.  See Memorandum in Support at 7 (noting that third party is "entitled to believe the agent has the authority he purports to exercise only where a person of ordinary prudence, diligence and discretion would so believe") (quoting Great Northern Ins. Co. v. ADT Security Servs., Inc., 517 F.Supp.2d 723, 745 (W.D. Pa. 2007)); Brief in Opposition at 7 (noting that third party "can rely on the apparent authority of an agent when this is a reasonable interpretation of the manifestations of the principal" and "[a]n admitted agent is presumed to be acting within the scope of his authority where the act is legal and the third party has no notice of [limitations on authority]") (quoting Great Northern); Plaintiffs' Sur-Reply Brief at 3 (quoting SEI Corp. v. Norton & Co., 631 F.Supp.597, 502 (E.D. Pa. 1986) (holding that where principal "knows or has reason to know that another has [acted without authorization], and that a third person has been deceived thereby and is likely to act upon his erroneous belief, he must take [reasonable] steps to correct the misrepresentation . . . to avoid liability") (quoting Restatement (Second) of Agency § 103, cmt. c).[14]

### B.  Parole Evidence Rule

The Plaintiffs allege, and have proffered evidence, that:

DEF and Iron Mountain (by Roth as signatory) entered into a written Lease Agreement on November 22, 2000 for space in the Boyers facility, and that Iron Mountain thereafter provided workspace, rent-free, to DEF until it moved into its Boyers space in approximately

---

[14] Defendant appears, in its discussion of apparent authority, to conflate considerations of actual authority.  See Memorandum in Support at 10 ("More importantly, whatever Roth's title, it would not establish that he was authorized to enter into joint ventures on behalf of Iron Mountain.").  Plaintiffs were not required to "establish" Roth's authority; to the contrary, the question is one of reasonable indicia.

June, 2001.  The Lease expressly provides that Iron Mountain would not lease other space in the Boyers facility to "a client that plans to operate a business substantially the same as [that] operated by [DEF]."  Second Amended Complaint at 6.

As noted in this Court's July, 2007 Report and Recommendation, Iron Mountain errs in its assertion that the existence of a written lease agreement as to DEF's rental of underground storage space from Iron Mountain forecloses , by virtue of the parol evidence rule, Plaintiffs' causes of action.

> To the contrary, the causes of action alleged are largely premised on the existence of a joint venture for the provision of digitization services, which included a digitization-service agreement.  As Plaintiffs observe, the parol evidence rule does not bar claims (a) asserted by non-parties to the Lease; (b) based on a separate, distinct agreement not included within the Lease parameters; and/or (c) arising from and supported by communications occurring *subsequent* to the Lease.  See Plaintiffs' Opposition [to Motion to Dismiss] at 13-20 and case citations therein); id. at 18-20 (observing that the claims are based substantially on post-lease conduct).

Report and Recommendation at 4.  As this language indicates, the parol evidence bar alleged would not extend to Plaintiffs Media Holdings, LLC or EDA Acquisition, LLC, who were not parties to the lease.[15]  Nor would it extend to claims for damages arising from subsequent

---

[15]  Cf.  Second Amended Complaint at 2, 7 (explaining that EDA Acquisition, LLC was formed by DEF investors in Spring, 2002 in reliance on Defendant's representations and to meet its requirements and, thereafter, "almost all of the work that Iron Mountain subsequently provided . . . was directed to, priced by, and performed by EDA"); Plaintiffs' Sur-Reply Brief at n. 2 (citing Roth's testimony that there was a "verbal agreement for EDA to pay us 15% on business" with Defendant's customers).  In light of these and other factual contentions, Defendant's assertion that the parole evidence rule applies to EDA and/or Media Holdings as parties "claiming rights [solely] by virtue of their relationship to a party to a written agreement" (*i.e.*, the Lease), is misplaced.  See Defendant's Reply Memorandum at 8-9.  As discussed throughout this Opinion, the Imagers proffer evidence of various ongoing representations and undertakings, with resultant reliance, related to the provision of imaging/digitization services to Boyers facility clients and not encompassed in/defined by the real property lease between DEF and Iron Mountain.

representations and conduct.[16]

Moreover, the Lease is clearly but a piece of the parties' alleged dealings.  Although
Defendant asserts that the alleged oral agreement regarding "exclusivity" was discussed during
negotiations of, and specifically addressed in, the Lease,[17] on its face the Lease addresses only
that which a property rental agreement typically would, *i.e.*, the owners' lease of space in the
same facility to a competitor.[18]  It is silent as to the parties' alleged imaging services agreement,
including, *e.g.*, understandings/undertakings as to existing business, exclusive referrals of
storage client business, and marketing.[19]  Compare Memorandum in Support at 13 (quoting Kehr
Packages, Inc. v. Fidelity Bank, N.A., 710 A.2d 1169, 1174 (Pa. Super. 1998) ("[W]here the
cause of action rests *entirely* on an alleged oral understanding concerning a subject which is
dealt with in a written contract, it is presumed that the writing was intended to set forth the entire
agreement as to that particular subject.") (emphasis added) with, *e.g.*, International Milling Co. V.
Hacmeister, 110 A.2d 186, 191 (Pa. 1955) (holding parol evidence rule does not apply where no
single writing embodied or was intended to embody entire understanding).

---

[16]  Defendant raises this defense as to all but the misrepresentation claims.  Cf.
Memorandum in Support at 13 ("The parole evidence rule bars evidence of a prior oral
agreement to the extent it conflicts with a subsequent written agreement.").

[17]  See id. at 14.

[18]  See id. at 4, 14 ("This lease was to 'reflect the fact that nobody else would be doing
this work in the mine.'"); 15 ("[I]n Medved's view, the Lease restriction was "a memorialization
of part of the deal."").  See also Brief in Opposition at 13 (observing that "the 'exclusivity'
provision in the Lease . . . *only pertains to the use of property owned by the Lessor*" is silent
regarding parties' exclusive service provider agreement) (emphasis in Brief).

[19]  See Plaintiffs' Sur-Reply Brief at 4 (asserting that oral contract regarding digitization
venture "was separate from, and entirely consistent with, the Lease") (emphasis in original);
Brief in Opposition at 12 (quoting Lease integration clause provision that it constituted entire
agreement "*concerning the subject mater contained*" therein) (emphasis in Brief).

### C. Existence of Joint Venture

Defendant properly observes that, under applicable Pennsylvania, law, the requisite elements of a "joint venture" include the following: (1) each party must make a contribution of capital, services, skill, knowledge, materials or money; (2) profits must be shared; (3) there must be a joint proprietary interest and right of mutual control over the subject matter; and (4) usually there is a single business transaction.  See Memorandum in Support at 17-18 (citing, *e.g.*, Snellbaker v. Herrmann, 462 A.2d 713, 716 (Pa. Super. 1983)).[20]  Defendant asserts that this claim fails as a matter of law because Plaintiffs cannot reasonably establish the second or third elements.  The Court concurs that the element of profit sharing is fatal to the claim.

The element of "profit sharing" in a joint venture requires that the profits be joint and not several.  See, *e.g.*, In re Computer Personalities Sys., Inc., 284 B.R. 415, 421, 423 (Bank. E.D. Pa. 2002) (concluding that profits were not shared where one party received payments based on percentage of gross charges collected by the other and, accordingly, "one of the parties could have enjoyed an individual profit, while the other might have sustained an individual loss").[21]  Here, as in In re Computer Personalities, Iron Mountain's profit was to be a percentage mark-up

---

[20]  See also Beavers v. West Penn Power Co. 436 F.2d 869, 873 (3d Cir. 1971) ("To constitute a joint venture under Pennsylvania law certain factors are essential: 1) each party must make a contribution of capital, materials, services or knowledge; 2) profits must be shared; and 3) there must be a joint proprietary interest in and right of mutual control over the subject matter of the enterprise.") (citing Richardson v. Walsh Constr. Co., 334 F.2d 334 (3d Cir. 1964); McRoberts v. Phelps, 138 A.2d 439 (1958)); In re Tobacco Road Associates, LP, 2007 WL 966507, *7 (E.D.Pa. 2007).

[21]  As Plaintiffs emphatically note, see Brief in Opposition at16-17, this decision applied Delaware law.  The Court for the Eastern District of Pennsylvania observed, however, that it found no difference between Delaware and Pennsylvania law on the issue of profit sharing required for a joint venture.  The relevant cases cited in Plaintiffs' Brief in Opposition are distinguishable for reasons ably set forth in Defendant's Reply in Support at 10-12.

calculated on the amount invoiced by the Imagers, *i.e.* a "gross revenue" figure, not on the

Imagers' net profit.  Iron Mountain's mark-up was independent of Plaintiffs' profit margin,

which was self-determined.  Cf.  Memorandum of Support at 19-20 (citing testimony that the

Imagers lost money on contracts performed in 2005 and were not profitable throughout their

time of operation at the Boyers facility).  Cf. also In re PCH Assocs., 949 F.2d 585, 599 (2d Cir.

1991) (applying Pennsylvania law and concluding that joint venture requires share in the net

profits, *i.e.*, total revenue minus expenses); Defendant's Reply Memorandum at 9-11.

Plaintiffs' evidence in this regard does not reasonably support its claim.  Compare

Second Amended Complaint at 5 ("The parties agreed that Iron Mountain would market and sell

DEF's services to its customers at a 15% mark-up of the original pricing."); id. at 9 (explaining

that "Iron Mountain would outsource [digitization] work to plaintiffs, sell those services as part

of [its] package of record management capabilities, and earn its money . . . by taking a 15%

mark-up")[22] with id. at 2 (asserting that "the parties agreed that they would share the profits

generated by these referrals").

Because it concludes that the parties did not have a profit sharing arrangement, the Court

need not reach Defendant's claim that it also did not exercise joint control of the venture.  See

_____

[22]  Cf.  *supra* n. 9 ("If a potential customer rejected the pricing as too high, the parties
were to 'jointly reduce their prices in order to obtain the customer's business'.  If, after joint
reduction, the business was not obtained, Iron Mountain could 'obtain a quote from an outside
source, which Plaintiffs would be allowed to match.'") (quoting  Second Amended Complaint at
6).  Thus, under the arrangement as alleged by the Imagers, although the parties would attempt a
mutually-agreeable price reduction if necessary to obtain a job, ultimately, Plaintiffs would have
to decide whether to lower their profit margin further to obtain a particular job.  And this was
independent of Iron Mountain's mark-up on the service-provider's quote.  That is, the profits
were several, not joint.  Cf. also Memorandum in Support at 22 (citing testimony that the
Imagers did not know what percentage mark-up Iron Mountain was applying to the costs of
Plaintiffs' services and that such information was not shared with them).

Memorandum in Support at 21-22.  It therefore observes, but does not decide, that the evidence

may suffice to raise material fact questions regarding, *e.g.*, the extent of Iron Mountain/Roth's

involvement in the management of imaging/digitization services at the Boyers facility, including,

*e.g.*, direction and/or degrees of control regarding staffing, equipment, and technology

acquisitions.

### D.  Breach of a Fiduciary Duty

Plaintiffs premise this claim on their "entrust[ment to] Iron Mountain [of] the critical task

of marketing, soliciting, and delivering digitization projects from Iron Mountain's existing

clients", Defendant's "sole control over and information regarding the customer relations and

interactions", and its marketing representations and requirements directions.  See Second

Amended Complaint at 17-18.

As discussed above, this Court concurs with Defendant in concluding that the evidence

could not reasonably support the requisite elements of a joint venture agreement and,

accordingly, there is no cause of action for breach of fiduciary duty flowing from a joint venture

arrangement.  See Memorandum in Support at 23.  Nor do the business transactions alleged

otherwise support a claim for breach of fiduciary duty.  See id. at 23-24 (citing, *e.g.*, Etoll. Inc. v.

Elias/Savion Adver., Inc., 811 A.2d 10, 23 (Pa. Super. 2002) (finding crucial distinction where

party did not "surrender control of [its] affairs to a fiduciary or confidant or party in a position to

exercise undue influence" but entered into arms-length transactions).  See also Etoll, 811 A.2d at

23 (noting, in affirming summary judgment on breach of fiduciary claim, that "[i]f parties to

routine arms-length commercial contracts . . . were held to have a "special relationship",

virtually every breach of such contract would support a tort claim") (citing Elliott v. Clawson,

15

204 A.2d 272, 273 (Pa. 1986) (finding no special relationship between parties to arms-length business contract)).[23]

The Court notes, however, that (although it has not been expressly discussed in the parties' otherwise comprehensive briefs) intrinsic to Plaintiffs' breach of contract claim are considerations of both (a) Defendants' duty of good faith and fair dealing and (b) its duty to use its best efforts as the marketer for the imaging business developed to service its Boyers facility clients.[24]   It further notes that the allegations of Plaintiffs' claim for breach of fiduciary duty reflect the elements of Defendant's duty to use its best efforts.  See Second Amended Complaint at 17 ("Plaintiffs entrusted Iron Mountain with the critical task of marketing, soliciting, and delivering digitization projects from Iron Mountain's existing clients. . . . [P]laintiffs were not permitted to make direct contact with any potential digitization clients . . . [and] Iron Mountain had sole control over information regarding the customer relations and interactions . . . ."); id. at 7 ("DEF, relying on Iron Mountain's promises, set up its business inside the mine, becoming, effectively, a captive vendor . . . . almost entirely dependent on Iron Mountain for its revenue

---

[23]  Imposition of the degree of duty of a *cestui que trust* is appropriately and generally inapplicable as between parties to a commercial relationship knowingly entered into for each party's own profit.

Plaintiff's citation to PTI Converted Paper Prods., Inc. v.Stone Container Corp., 1995 WL 434577, *1 (E.D. Pa. July 24, 1995) is inapposite, as the service provider therein had been entrusted with plaintiff's proprietary/confidential customer list, which it then misappropriated.

[24]  Cf.  Second Amended Complaint at 6 ("Iron Mountain maintained control over the customer relationships, and plaintiffs were entirely relying on [its] representations that it would market plaintiffs' services, provide the digitization work to plaintiffs, and properly employ the agreed upon 15% mark-up when pricing digitization work to its clients.").

16

stream."); Brief in Opposition at 27.[25]

Significant Pennsylvania law indicates that a duty of good faith and fair dealing is part of every contract.[26]  And although it is unclear whether such duty gives rise to an independent cause of action, and no such Count is alleged in the case *sub judice*, it necessarily informs the fact finder's assessment of a defendant's contractual breach.[27]

In the circumstances of, *e.g.*, exclusive agency or a "captive vendor", the law also imposes an implied promise of best efforts in promotion/marketing.  See Wood v. Lucy, Lady

---

[25] But see Defendant's Reply Memorandum at 13-14 (asserting that Plaintiffs were able to - and did - solicit and perform work for other clients).

[26] See, *e.g.*, Donahue v. Federal Express Corp., 753 A.2d 238, 241 (Pa. Super. 2000) ("Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and enforcement.").  See generally Restatement (Second) of Contracts, § 205 (expressly providing that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and in its enforcement"); Bethlehem Steel Corp. v. Litton Indus. Inc., 488 A.2d 481, 600 (Pa. 1985); Germantown Mfg. Co. v. Rawlinson, 491 A.2d 138, 148 (Pa. Super. 1985); Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. 1992); Stamerro v. Stamerro, 899 A.2d 1251 (Pa. Super. 2005) ("[T]his 'Commonwealth has accepted the principle in [§ 205] that 'every contract imposes upon each party a duty of good faith and fair dealing . . . .'"); Livingstone v. North Belle Vernon Borough, 91 F.3d 515, 525-26 (3d Cir. 1996) (implying duty of good faith as necessarily "follow[ing] from the duty of good faith and fair dealing, *Restatement (Second) of Contracts* § 205"); id. at 526 n. 11 (noting that "[t]he duty of good faith and fair dealing exists not only under federal common law, but also under Pennsylvania law" and that "'[i]n the absence of an express provision, the law  will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract'").

[27] See, *e.g.*, Northview Motors, Inc. v. Chrysler Motors Corporation.  227 F.3d 78, 91 (3d Cir. 2000) (observing that "the Pennsylvania courts have cited [§ 205] for the proposition that every contract has an implied term that the parties will perform their duties in good faith"); id. (further observing that "[i]n practice, however, the courts have recognized *an independent cause of action* for breach of a duty of good faith and fair dealing only in very limited circumstances") See also Hershey Entertainment, 2005 WL 3320843, *8 (quoting Northview's holding that the "general duty of good faith is used as an 'interpretive tool to determine the parties' justifiable expectations'" but does not often give rise to an independent cause of action).

Duff-Gordon, 118 N.E. 214 (1917) (noting, in seminal case, that "[w]e are not to suppose that one party was to be placed at the mercy of the other") (quoted in HML Corp. v. General Foods Corp. 365 F.2d 77, 80 (3d. Cir. 1966)).  While Plaintiffs have not expressly alleged that they were contractually prohibited from soliciting imaging/digitizing work from any entity other than Iron Mountain, they have alleged understandings underlying the establishment/development of their enterprises and service capabilities - *i.e.*, that they spent millions of dollars to acquire staffing, knowledge, and technology expressly to meet the purported large-volume *in-facility* imaging/digitization needs of Iron Mountain's Boyers customers.  Such allegations are sufficient, in this Court's view, to bring the parties' agreement within the intended scope of the best efforts doctrine.[28]

---

[28] Cf.  Second Amended Complaint at 18 (alleging that Iron Mountain "simultaneously prevented plaintiffs from independently soliciting clients themselves").  Plaintiffs expressly evidence only that Defendant prohibited contact with Iron Mountain storage customers.  But a reasonable jury could find that, because the prospects of successfully soliciting *any other* business to transport its documents to/from the Boyer's underground storage facility - *not* for storage, but only to be digitized by an in-facility provider - were restricted, and/or that both Plaintiffs business location and their staffing/equipment/technologies were acquired/maintained at Defendant's direction to meet Boyers client-specific requirements, the Imagers were essentially "captive" to Iron Mountain.  The evidence suffices to raise material fact questions in this regard.  Compare, *e.g.,* Defendant's Reply Memorandum at 13-14 (asserting that Plaintiffs "performed work for, or solicited business from, a number of clients . . . completely independent of Iron Mountain" and that "EDA obtained work from its own direct sales efforts") with Plaintiffs' Sur-Reply Brief at 7 ("Plaintiffs surrendered marketing to businesses *within the Boyers Mine,* which . . . comprise[d] the overwhelming majority of Plaintiffs' business.").

Cf. also Tigg Corp. v. Dow Corning Corp. 962 F.2d 1119, 1125 (3d Cir. 1992) (noting that, in a non-exclusive arrangement, the marketing party's efforts to sell the product/services generally has little effect on the provider, who can solicit orders from other potential customers; but where the provider has only one outlet for its goods/services, its interests are inextricably bound up with the success of the marketer, and the obligation to use best efforts reflects that monopoly power); id. (further explaining that courts will imply a duty to use best efforts where such a covenant is essential as a matter of equity to give meaning and effort to the contract as a whole) (citing Wood).

Finally, under the relevant precedent, this "best efforts" obligation is understood as a further form of the duty of good faith and sound business judgment.  See Martin v. Monumental Life Ins. Co. 240 F.3d 223, 234 -235 (3d Cir. 2001) (citing National Data Payment Systems v. Meridian Bank, 212 F.3d 849, 854 (3d Cir.2000) (holding that "best efforts" requires diligence and an elevated duty of good faith)).  Compare Plaintiffs' Sur-Reply Brief at 8 (understanding Defendant's "breach[ of] its duty to market" the digitization services as a basis for breach of fiduciary relationship).[29]

### E.  Pennsylvania's Gist of the Action Doctrine

Count IV of the Second Amended Complaint, headed "Negligent Misrepresentation", asserts that Defendant "made material misrepresentations when it promised that it would provide millions of dollars of its customers' digitization business to plaintiffs in connection with the parties' exclusive agreement."  Although this Count lacks the degree of detail generally preferable for both the litigants and the Court, it may fairly be read - in light of the Complaint as a whole and in the manner most favorable to the Plaintiffs - to allege an essentially two-fold misrepresentation in the inducement claim.[30]  First, the Imagizers elsewhere allege more specifically that Iron Mountain misrepresented the existence of  materials already "in-the-

---

[29]  The Court notes that, under its analysis, Plaintiffs' supported allegations that Defendant (a) failed to market their digitization services; (b) imposed an excess mark-up on pricing to Boyers clients, thus rendering those services more difficult to market and injuring their business prospects; and/or (c) ultimately diverted in-facility digitization business to itself in direct competition, may each raise potential breaches of a "best efforts" duty.

[30]  Cf. GNC Franchising, LLC v. Khan, 2008 WL 612749 (W.D. Pa. March 3, 2008) (addressing claim facially pled as negligent misrepresentation as one for "fraudulent inducement as well"); Addie v. Kjaer, 2009 WL 453352, *4 (D.Virgin Islands 2009) (concluding that count "labeled as a negligent misrepresentation claim, could be construed as an inducement claim"). See Plaintiffs' Sur-Reply Brief at 8 (describing its "negligent misrepresentation claim [as one] for 'fraud in the inducement'").

pipeline" and simply awaiting an in-facility provider to convert them to digital,[31] and that

Plaintiffs relied on this misrepresentation. Second, they allege that Iron Mountain misrepresented

that it would market the imaging services, which misrepresentation also induced Plaintiffs to

contract with Defendant and to develop the requisite capabilities. And while Count IV alleges

that Defendant made its misrepresentations "without obtaining knowledge as to their truth or

falsity", *i.e.*, negligently,[32]  Plaintiffs' Complaint also alleges that it made them knowing that it

"did not intend" to deliver the promised business, *i.e.*, fraudulently.[33]

---

[31]  See Report and Recommendation at 5 ("Plaintiffs specifically allege that Defendant made express representations regarding its commitment to provide millions of dollars in existing business and specific quantities of material then-available for digitization."); id. (providing citations to record); Memorandum in Support at 4 ("Medved also testified that Roth told him that there was a 'backlog' of customers 'clamoring' for digitization services.'"); Second Amended Complaint at 7.  Cf. id. at 10 (asserting that in 2003-2004, Roth represented that Plaintiffs would be provided "at least $10,000,000 in digitizing revenue" and that the work expected to become available "was likely to generate" between $30-$40M in gross revenue).

[32]  Seconded Amended Complaint at 18.  For the tort of negligent misrepresentation, Pennsylvania courts require proof of the following elements: (1) misrepresentation of a material fact (2) made under circumstances in which the misrepresenter ought to have known its falsity (3) with an intent to induce another to act on it and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.  See, e.g., Gilliland v. Hergert, 2007 WL 4105223, at *6 (W.D.Pa. Nov.19, 2007) (citing Bortz v. Noon, 729 A.2d 555, 561 (Pa.1999).  See also Bilt-Rite Contractors, Inc. v. The Architectural Studio, 866 A.2d 270, 287 (Pa. 2005) (adopting the Restatement (Second) Torts, § 552 (1977), elements of a cause of action for negligent misrepresentation:  One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information).

[33]  Id.  Under Pennsylvania law, fraudulent misrepresentation has six elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. Overall v. University of Pa., 412 F.3d 492, 498 (3d Cir. 2005) (citing Gibbs v. Ernst, 647 A.2d 882, 889 (Pa.1994)).

1. <u>Marketing</u>

Taking the second claim first, it appears to this Court quite possible - but not certain - that a claim for misrepresentational inducement that is premised on contract performance would be subsumed into the Imagers' breach of contract claims.  <u>See</u> <u>Guy Chemical Co., Inc. v. Romaco N.V.</u>, 2007 WL 184782, **5-6 (W.D. Pa. Jan. 22, 2007) (concluding that Pennsylvania's gist of the action doctrine may in certain circumstances bar fraudulent inducement claims and that proposed tort claim was "inextricably intertwined" with contract performance where performance specifications of pre-contractual negotiations were later included in contract).  A summary of the applicable doctrine follows:

"Generally, the gist-of-the-action doctrine precludes a party from raising tort claims where the essence of the claim actually lies in a contract that governs the parties' relationship." <u>Sullivan v. Chartwell Investment Partners, LP</u>, 873 A.2d 710, 718 (Pa. Super. 2005).  "[T]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus."  <u>Redevelopment Authority of Cambria County v. International Insurance Co.</u>, 454 Pa. Super. 374, 685 A.2d 581, 590 (1996) (en banc), <u>quoted in</u> <u>Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.</u>, 247 F.3d 79, 103 (3d Cir. 2001).  Accordingly, a claim is limited to contract law when "the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts."  <u>Bash v. Bell Telephone Co.</u>, 601 A.2d 825, 830 (1992).[34]

---

[34] <u>See also</u> <u>Koresko v. Bleiweis</u>, 2004 WL 3048760, *3 (E.D. Pa. Dec. 30, 2004) (observing that the existence of a contractual relationship is not dispositive in determining whether a tort claim may lie; rather, the essential question is the violation of an additional duty distinct from the contractual obligations) (citing <u>Bohler-Uddeholm</u>).

Thus, the Pennsylvania Superior Court has frequently applied the gist of the action doctrine to claims for fraud in performance of a contract, but not to claims for *fraud in the inducement*.  See <u>Sullivan</u>, 873 A.2d at 719 ("Following a thorough analysis of the issue, the <u>eToll</u> Court concluded that the gist-of-the-action doctrine would apply to bar a claim for fraud in the performance of a contract.  However, it also observed that the gist-of-the-action doctrine would not necessarily bar a fraud claim stemming from the fraudulent inducement to enter into a contract.") (citing <u>eToll, Inc. v. Elias/Savion Advertising, Inc.</u>, 811 A.2d 10 (Pa. Super. 2002)).[35] <u>See also</u> <u>Air Products and Chemicals, Inc. v. Eaton Metal Products Co.</u>, 256 F. Supp.2d 329, 341 (E.D. Pa. 2003), <u>quoted in</u> <u>Sullivan</u>, 873 A.2d at 719 (noting that "fraud in the inducement claims are much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists").[36]  This distinction becomes somewhat problematic, however, where the alleged misrepresentations that induce a contract also constitute promises that form the contract's terms.

In <u>Williams v. Hilton Group PLC</u>, 93 Fed. Appx. 384 (3d Cir. 2004) (*per curiam*), the Third Circuit affirmed dismissal under the gist of the action doctrine of fraud claims involving breach of an exclusive negotiation agreement despite evidence that the defendant never intended to honor its promise of exclusivity.  However, the <u>Williams</u> Court did not have the benefit of the

---

[35]  The <u>eToll</u> Court summarized the "persuasive authority interpreting Pennsylvania law" on the gist of the action doctrine as barring tort claims: (1) "arising solely from a contract between the parties", (2) where "the duties allegedly breach were created and grounded in the contract itself", (3) where "the liability stems from a contract", or (4) where the tort claim "essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract."   810 A.2d at 19.

[36]  The Court in <u>Air Products</u> further explained that "fraud to induce a person to enter a contract is generally collateral to (i.e., not 'interwoven' with) the terms of the contract itself".  256 F. Supp.2d at 341.

Superior Court's subsequent decision in <u>Sullivan</u>, which permitted a claim for fraud in the inducement predicated upon the same promises that it found to be sufficient to make out a contract claim.  As the <u>Sullivan</u> Court explained,

> Appellant alleged that Appellee fraudulently and/or negligently agreed to perform obligations that it never intended to perform in order to induce Appellant to agree to the proposed changes . . . . .  Accordingly, we conclude that since Appellant's tort claims relate to the inducement to contract, they are collateral to the performance of the contracts and therefore, are not barred by the gist-of-the action doctrine.

<u>Sullivan</u>, 873 A.2d at 719.  This conclusion undercuts the majority holding in <u>Williams</u>, and supports the dissent's view that under the Pennsylvania cases, where there is "fraudulent intent, i.e. a subjective and undisclosed intent not to perform, a fraud claim is stated." <u>Williams</u>, 93 Fed. Appx. at 390 (Becker, J., dissenting).[37]  <u>See also</u> <u>Williams</u>, 93 Fed. Appx. at 386, 387 (recognizing that the gist of the action doctrine "appears to call for a fact-intensive judgment as to the true nature of a claim", and accordingly explicitly limiting its *per curiam* opinion  to "the particular facts presented").[38]  <u>Compare</u> Second Amended Complaint at 18 (alleging that Iron Mountain did not deliver, "and did not intend to deliver", the promised digitization business) <u>with</u> Memorandum in Support at 27 (characterizing claim as a "subsequent refus[al] to give the

---

[37]  The Pennsylvania Superior Court's holding in <u>Sullivan</u>, as the most recent ruling of the intermediate appellate court, "must be accorded significant weight and should not be disregarded absent persuasive indication that the highest court would rule otherwise." <u>U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.</u>, 80 F.3d 90, 93 (3d Cir. 1996).

[38]  As noted above, Judge Becker's dissent in <u>Williams</u> distinguished, in light of Pennsylvania case law, those breach of contract cases in which the party had no present intention to perform the contract terms from those in which the party intended - but later failed - to perform.  As discussed in this Court's Opinion in <u>GNC Franchising, Inc. v. O'Brien</u>, the law in this area has been in some disarray.

promised business to the Plaintiffs").[39]

With these considerations duly noted, and because other related claims may proceed, this Court will deny Iron Mountain's request for summary judgment on this portion of the Imagers' misrepresentation claim, declining to determine in advance of necessity the complex and novel question of whether the Pennsylvania Supreme Court would, in a circumstance alleged (*i.e.*,

---

[39] Cf. Memorandum in Support at 16 (noting that Medved proposed a revision to the Lease requiring that Iron Mountain not permit "any other property owned or controlled by Lessor to be used for the operation of any business substantially the same as the business operated by Lessee", and that Iron Mountain rejected this language as "too broad", replacing it with a provision that it "not enter into a new Private Record Center lease with a client that plans to operate a business substantially the same as the business operated by Lessee"). This language, in addition to incorporating qualifying and/or ambiguous language - such as *new* lease, with a *client*, that *plans* to operate a similar business - may suggest Defendant's intention to preserve its right to operate such in-facility business itself, despite its alleged contemporaneous representations that it would not. See id. at 17 (indicating that such was Roth's intent). Or it may reasonably reflect, as Medved assertedly understood it, the parties' agreement that property *in the Boyers facility* (*e.g.*, as opposed to the broader language of "any other property owned or controlled" by Iron Mountain) would not be leased for an imaging/digitization "business". The reasons for the choice of language and the parties' reasonable understandings of its import remain questions of fact.

inducement by *false representation* of Defendant's *present intent* to market Plaintiffs' services), bar such claim under the gist of the action doctrine.[40]

### 2. Misrepresentations Regarding Existing Business Prospects

As to this basis, the Imagers are clearly entitled to proceed, as a reasonable jury could find that Iron Mountain made actionable misrepresentations where it represented that its Boyers' clients were awaiting/in need of millions of dollars of imaging/digitization services able to be performed within the security of the storage facility.  This information would typically factor into a decision to invest substantial monies in the development of an in-facility digitization service, and Plaintiffs have proffered sufficient evidence to reasonably support their claim.

Moreover, this Court concludes that, given the facts discussed *supra*, these misrepresentations regarded matters beyond the performance of express contractual duties and constituted violations of duties imposed as a matter of social policy and embodied in the law of torts.  They are, therefore, actionable in tort and outside Pennsylvania's gist of the action bar.[41]

---

[40] See GNC Franchising, Inc. v. O'Brien, *supra* (concluding that Court should follow the more prudent course of withholding judgment on an unsettled question of law until the facts definitively found) (citing Petition of Bloomfield S.S. Co., 298 F.Supp. 1239, 1242 (D.C.N.Y. 1969)).  See also id. (citing Cohesive Technologies v. Waters Corp., 130 F.Supp.2d 157, 160 (D.C. Mass. 2001)(explaining that denial of motion is appropriate where movant "fails to show that no responsive legal theory will be available to the opposing party, along with facts to support that theory, to defeat the asserted entitlement to summary judgment"); Wright & Miller, 10A Fed. Prac. & Proc. Civ. 3d § 2725, text at n. 13 (observing that the difficulty of the legal issues involved is relevant to a grant/denial of summary judgment and that complex questions of law frequently require concrete factual development).

[41] See Memorandum in Support at 26 (discussing distinction between obligations defined by contract terms and those imposed by larger social policies) (citing Bohler-Uddeholm Am., Inc., 247 F.3d at 103).

**F. Statute of Limitations**

Although Iron Mountain asserts that this claim is barred by the applicable statute of limitations,[42] recovery by the Imagers for misrepresentation is not clearly time barred.

First, although the statute begins to run when a claimant has been "put on inquiry notice . . . of possible fraud", and a claimant must then use reasonable diligence to inform itself of the basis for its claim,[43] the question of when particular circumstances give rise to inquiry notice is generally properly left to the fact finder.  See, e.g., Guy Chemical, 2007 WL 184782 at **4-5 (noting level of factual dispute in the litigation and observing that "the point at which the complaining party should  reasonably be aware that he has suffered an injury is generally an issue of fact to be determined by the jury . . . [and o]nly where the facts are so clear that reasonable minds cannot differ may the commencement of the limitations period be determined as a matter of law") (quoting Melley v. Pioneer Bank, N.A., 834 A.2d 1191, 1201 (Pa. Super. 2003)). Under the circumstances sub judice, it appears to this Court that the reasonableness of Imagers' course of conduct, their acceptance of Roth's ongoing representations in response, and at what point they should have been aware that they had suffered an injury for which they were entitled to redress, are questions which fall within the provenance of the jury.[44]

---

[42] See Memorandum in Support at 28 (citing 42 Pa. Cons. Stat. § 5524(7)); cf., e.g., Beauty Time v. VU Skin Sys., 118 F.3d 140, 144 (3d Cir. 1997).

[43] Memorandum in Support at 28 (quoting Ciccarelli v. Gichner Sys. Group, Inc., 862 F.Supp. 1293, 1301 (M.D. Pa. 1994)); Brunea v. Gustin, 775 F.Supp. 844, 846 (W.D. Pa. 1991) (concluding that statutory period begins to run when the injured party "possess sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate").

[44] Compare, e.g., Memorandum in Support  at 5, 29 (observing that the digitization services was operational in 2002); id. at 2, 28-30 (asserting that, as the Imagers were promised "a backlog" of "existing digitization orders", and "no work was forthcoming once the Plaintiffs were operational", no evidence could reasonably support the conclusion that the statute had not

Second,  Defendant's alleged ongoing/continuing misrepresentations as to, *e.g.*, available business, exclusivity, and marketing, could reasonably be found to have constituted further fraud/fraudulent concealment that tolled the statute of limitations.  See Brief in Opposition at 31-32; 42 Pa.C.S.A. § 5532; York Excavating, Inc. v. Employers Ins. Of Wausau, 834 F.Supp. 733 (M.D. Pa. 1993) (observing that concealment tolls statute of limitations).

### G.  Reasonable Reliance

Defendant moves for summary judgment of Plaintiffs' misrepresentation and promissory estoppel claims on grounds that no reasonable jury could find reasonable reliance.  See Memorandum in Support at 30.  More particularly, it asserts that (1) Medved, an experienced commercial litigation attorney and Plaintiffs' representative, could not reasonably rely soley on Roth's oral representations "in spending millions of dollars to establish a digitization business"; (2) "nothing precluded Medved from confirming the purported demand for digitization work with [Iron Mountain's Boyers clients] themselves"; and (3) Medved admitted knowing that "it was unclear what impact the terrorist attacks of September 11, 2001 would have on demand for digitization" and that "lack of funding or other priorities" could prevent a company from proceeding with digitization despite expressed desire to do so.  Id. at 30-32.

The Court observes that:

--------

begun to run before October 2004, more than two years before suit was filed in October, 2006) with id. at 29 (noting that Roth told Medved "there was a 'gestation period' before the work would be available" and that although Medved "did push Roth on it, [he] didn't want to push too hard, because [he] didn't want to alienate him"); Plaintiff's Sur-Reply Brief at 10 (citing deposition testimony of Medved that falsity of Roth's representations regarding backlog of work "didn't cross [his] mind" while Plaintiffs were not yet ready for high-volume work); Brief in Opposition at 31 (noting that Plaintiffs were prohibited from directly contacting Boyers clients).

(1) The case *sub judice* is brought by several entities.[45]  And while the Imagers reliance on Roth's representations and undertakings in an exclusively oral contract of the type and scope alleged was most likely unusual,[46] and quite possibly ill-advised, it was not so unreasonable as to preclude consideration of their claims by a jury.

(2) Plaintiffs allege that they were precluded by Iron Mountain from contact with its Boyers facility clients.  And Plaintiffs were no more required as a matter of law - absent any indicia to the contrary - to establish/verify Roth's representations as to his clients' digitization business than those regarding his authority (see Section IV(A), *supra*).

(3) Plaintiffs' allegations are that (a) Defendant expressly represented the Boyers facility to be the locus of significant "pipe-lined" digitization work, and millions of dollars more digitization work that would be actively solicited by Iron Mountain; (b) Plaintiffs reasonably relied on those representations and undertakings, which c) were repeated/continued over a period of years; and d) said representations ultimately proved untrue and/or said undertaking were unperformed.  Accordingly, neither the tragic events of September 11th nor contingencies related to business economics warrant summary judgment on their claims.

Order to follow.

---

[45]  Cf. Brief in Opposition at 32 n. 16; 33 (observing that Medved was "one of numerous individuals . . . who were involved in the formation or operation of Plaintiffs' business" and who "heard, and relied upon, Roth's representations").

[46]  See *supra* n. 4; see also Report and Recommendation at 5 ("The question of 'why the parties executed a written . . . lease while neglecting to draft a single document to memorialize what the Plaintiffs content was a multimillion dollar joint venture' is clearly significant.").

LISA PUPO LENIHAN
United States Magistrate Judge

Dated: September 18, 2009

cc: Counsel of record